IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

SCHICKER V. CADY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

RICHARD SCHICKER, APPELLANT,

V.

BRANDI CADY, APPELLEE.

Filed May 7, 2024.    No. A-23-455.

Appeal from the District Court for Douglas County: TODD O. ENGLEMAN, Judge. Affirmed.

Richard Schicker, pro se.

Joseph P. Naatz, of Kreikemeier Law, L.L.C., for appellee.

MOORE, ARTERBURN, and WELCH, Judges.

MOORE, Judge.

## INTRODUCTION

Richard Schicker brought a complaint against a former client, Brandi Cady, seeking payment for attorney fees under a contingency fee agreement. Following a bench trial, the district court for Douglas County dismissed Schicker's complaint, finding that there had been no meeting of the minds during the formation of the agreement and thus there was no valid, enforceable contract. For the reasons contained herein, we affirm.

## STATEMENT OF FACTS

On October 23, 2018, Schicker filed a complaint alleging that he had entered into a written contract with Cady whereby Schicker was to represent Cady in a claim against Lincoln Financial Group (LFG) for life insurance benefits owing to Cady due to the death of Cady's husband. Schicker alleged that he was retained because LFG was refusing to pay any amount of insurance benefits and that by the terms of the contract with Cady, Schicker was to receive at least 40 percent

of any amount paid by LFG. LFG later agreed to pay Cady the full policy amount and the complaint sought judgment against Cady for 40 percent of that amount, plus any costs incurred by Schicker.

Cady filed an answer generally denying all allegations in the complaint. The answer also alleged that Schicker had cancelled the written contract with Cady on October 2, 2017, as evidenced by his signature and writing on the contract.

Trial on the matter was held on April 5, 2023, at which Schicker, Cady, and Cynthia Klenda, a senior claims examiner with LFG, testified. The following evidence was adduced.

In January 2017, Cady's husband filed an application for a $200,000 life insurance policy through his employer and became eligible for the benefit on February 1. The husband was scheduled to have an associated physical exam on June 21, but was killed in a car accident on June 14.

Cady testified that at the time of her husband's death, the couple had three young children, and that she immediately attempted to collect his life insurance benefits. Having not yet received the full policy amount, Cady sent a letter of complaint to the Nebraska Department of Insurance on approximately September 14. Cady's letter to the Department of Insurance was not presented at trial.

Cady called Schicker's law office on approximately September 19, 2017. Cady testified that she called to inquire about a personal injury claim, as she had heard from community members that the highway where her husband was killed had been deemed dangerous and was soon to be under construction. Intake notes from Cady's initial call to the law office, authored by Schicker and his assistant, were entered into evidence. The intake notes reference an accidental death, a denied life insurance claim based on the fact that the husband had died before his scheduled physical exam, and that a complaint with the Department of Insurance had already been filed.

The first in person meeting between Cady and Schicker occurred on September 21, 2017, for roughly an hour. Cady testified that the two discussed the personal injury claim and the condition of the highway. They also discussed the insurance claim because Schicker "kept going back to that." It was not Cady's intention to discuss the insurance claim with Schicker, though she assumed the facts of the various claims were intertwined as they had arisen from the same accident. Schicker testified that during the meeting, he had been hired to represent Cady for both a personal injury claim and an insurance claim. Schicker's notes regarding the September 21 meeting were also entered into evidence, though Schicker was unable to recall the date he authored the notes. One page of notes is titled "Auto Crash Plan" and the other "Issues," which Schicker testified were checklists related to the personal injury claim and the insurance claim, respectively.

A contingency fee agreement between Cady and Schicker was executed during the September 21 meeting. The agreement was entered into evidence and reflects that Schicker was to be paid 40 percent of the amount recovered or settled on behalf of Cady. In the first paragraph of the fee agreement is the statement, "[c]lient may have a claim against _____" and the section is filled in with "Lincoln Financial[.]" The fee agreement is signed by both parties. Under the signatures is the handwritten statement: "Any fees pursuant to § 44-359 shall go to Brandi." This statement is initialed by "R.J.S. and BAC". Neither party testified about this handwritten statement.

Cady identified her signature at the bottom of the fee agreement but denied that the blank space of the agreement, relating to the claim, had been filled in at the time she signed it. She did

not recall "Lincoln Financial" appearing anywhere in the fee agreement. Schicker did not testify to the condition of the fee agreement at the time of the parties' signatures.

Schicker testified that he instructed Cady to send him any information she had regarding her husband's life insurance. In an email dated September 26, 2017, Cady sent Schicker insurance paperwork from 2016, her husband's paystubs showing his deductions, and a postcard informing her husband of the scheduled physical exam. The following day, Schicker spoke on the phone with an individual named Kara Vincent, who he believed was a representative at LFG. Vincent apparently reported to Schicker that "Lincoln Financial Group had changed its decision not to pay," and approved a $130,000 life insurance claim. Klenda testified that Vincent was a "broker" and not affiliated with LFG.

Klenda testified that on September 28, 2017, she contacted Cady directly to inform her that Klenda had received Cady's complaint from the Nebraska Department of Insurance. Klenda's claim notes were entered into evidence and reflect that during her conversation with Cady on September 28, she told Cady that a life insurance claim had not been submitted to LFG and that due to a miscommunication, Cady's complaint letter had served as LFG's first notification of the husband's death. During this conversation, Cady also requested reimbursement of attorney fees as she was "told by Kara Vincent to hire an attorney because she would be lucky to get [$]20,000." Klenda told Cady that LFG would not reimburse any attorney fees because no claim had been submitted and LFG had not advised Cady to hire an attorney.

An email from Klenda to Cady dated the following day was entered into evidence. The email confirmed that Cady had supplied the death certificate to Klenda and that Klenda had submitted the information necessary to build a life insurance claim. The email also states that, "[s]ince we are working together to get this claim completed and you are the named beneficiary, you do not need an attorney to work with us to get this claim paid." Cady forwarded Klenda's email to Schicker roughly 20 minutes after receiving it.

On October 2, 2017, Klenda's claim notes reflect that she had a phone call with Cady regarding Cady's payment preference. Cady requested that LFG not pay the benefit until October 6. When Klenda asked about the circumstances of the request, Cady responded that it was because "she did not use an attorney to get this claim paid and that the group told her to hire an attorney [and] that she wanted to settle things with the attorney since he gets paid if payment is made." The notes indicated that Klenda received approval from her manager for the delayed payment to be initiated on October 6 and completed on October 9, and communicated this to Cady. At trial, Cady did not recall requesting Klenda to delay payment, though she acknowledged that she had been aware that she was going to be paid for the insurance claim before she ended her fee agreement with Schicker.

On October 2, 2017, at 10:36 a.m., Cady sent Schicker an email with the subject line "Cancellation of Services." The email states:

> At this time, I have a family member who is going to handle insurance claims for Lincoln Financial. This email serves as a notification that your services are no longer needed for this matter. Please send a statement for amount owed to date.
>
> I do still want to retain you for possible case regarding the accident itself.

Schicker testified that he was surprised by the email as Cady had never communicated her dissatisfaction with his services. Schicker then called Cady and requested that they meet to discuss the email in person.

Later that day Cady brought two friends with her to the meeting with Schicker. Cady testified that Schicker often talked in circles and that she "couldn't get a word in edgewise and I needed somebody to be there to help me get through to him that . . . he was getting fired." Cady denied firing Schicker because she did not want to pay him a contingency fee on the insurance claim, rather she testified that Schicker was not pursuing the personal injury claim, the sole claim for which he was hired to represent her. Cady also noted that Klenda had told Cady that she did not need an attorney.

Cady testified that she had been dissatisfied with Schicker's representation prior to learning that she would be paid for the insurance claim. Cady recalled a lunch meeting between herself and Schicker to which Schicker brought his wife. Cady's case was not discussed until the last few minutes of the hours long meeting, and even then, Cady felt that Schicker was reluctant to discuss the personal injury claim. When Cady would bring up the personal injury claim, Schicker continuously returned to the insurance claim. Cady described the lunch meeting as "awkward" and "odd[.]" Cady testified that she had tried to talk about her issues with Schicker's representation during the lunch meeting and in subsequent phone calls to his office, but that Schicker would not answer his phone.

Schicker testified that he had focused on pursuing the life insurance claim before the personal injury claim because Cady was "very stressed about the fact that the insurance company had turned down her claim," and he was acting "to get a good answer for her quickly to alleviate her stress."

During the October 2, 2017, meeting, the parties canceled their fee agreement. Another copy of the fee agreement was entered into evidence, which includes the additional notation "Agreement cancelled as of 10-2-2017" at the bottom of the form and Schicker's signature below the notation. Schicker acknowledged that the notation evidenced his agreement to cancel the contingency fee agreement with Cady.

After Cady fired Schicker on October 2, she offered to pay him his hourly rate for any work he may have performed on her case. Cady testified that Schicker responded that he did not want Cady's money, but the insurance money from LFG. Cady left the meeting with the understanding that any agreement between herself and Schicker had been terminated and that she owed him nothing.

Schicker testified that as soon as he became aware that a claim had been paid, he began pursuing compensation for his fees through LFG. A letter from Schicker to Klenda dated October 3, 2017, states: "Brandi told me you would consult with your supervisor about paying my attorney fees, because Brandi shouldn't have had to hire an attorney for this claim. I enclose a page showing my time. I believe it totals 58.6 hours. My normal hourly rate is $250 per hour." Attached to the letter is an itemized bill showing the time Schicker allegedly expended on Cady's case, including several hours spent on "research on issues," "research on bad faith," "expert witness needed, began search," "trial strategy," and "more research." On cross-examination Schicker conceded that he was unable to recall the details of these time entries or provide any notes or documentation related to the over 30 hours of legal research.

On October 5, 2017, Cady sent Klenda an email with an attached copy of the parties' canceled fee agreement. On October 9, LFG sent a letter to Cady confirming that her husband's life insurance claim had been filed and approved for a $200,000 benefit.

Cady testified that she had done all of the work to collect the insurance claim herself. Klenda testified that the only phone call she had with Schicker occurred after the claim was paid and he was attempting to collect attorney fees from LFG.

The district court dismissed Schicker's complaint in a thorough order filed on May 18, 2023. The court pointed to the blank space in the fee agreement as to who the client may have a claim against and noted Cady's undisputed testimony that at the time the agreement was entered into by the parties, the actual fee agreement was not entirely completed.

Further, the district court noted Cady's testimony that she had retained Schicker to pursue only a personal injury claim as the result of her husband's car accident. The district court observed that a large portion of Schicker's own notes were dedicated to the personal injury claim. Though both parties agreed that the personal injury claim was at least a portion of why Cady had retained Schicker, that claim was not included in the fee agreement. The court found that there was no contract between the parties as not all terms were included at the time the agreement was signed, and there was no meeting of the minds as to whom Schicker was actually going to be pursuing a claim against.

Additionally, the district court found that Schicker lacked credibility. Schicker's itemized bill stated that he spent 58.6 hours of billable time over the course of 12 days working toward the collection of the insurance benefit. However, Schicker had "no evidence that either supported these hours of billable time or any evidence that could even minimally justify spending such an enormous amount of billable time on the collection of the insurance proceeds." The court was concerned that the itemized bill reflected that Schicker billed 4.3 hours of work on October 2, 2017, when he was notified by an email from Cady at approximately 10:30 a.m. that he had been fired. The court was additionally concerned about the testimony regarding a lunch meeting between the parties where Schicker brought his wife, thus destroying any attorney client privilege, and did not speak to Cady about her case until the last few minutes of the meeting, for which Schicker's itemized bill reflects that he billed 5 hours.

The district court found that Cady was the only person who performed any efforts necessary to work with LFG to recover the insurance proceeds and that all of Schicker's itemized bill entries did "not sway this Court that he actually took any action to collect these insurance proceeds," especially given Klenda's testimony that she never heard from or worked with Schicker in regard to paying out the proceeds. Klenda's only interactions in this regard were directly with Cady.

The district court concluded that no agreement had been formed between Schicker and Cady because there was no meeting of the minds as elicited by the testimony at trial. Additionally, from judging the credibility of the witnesses, Schicker was not entitled to any other recovery.

Schicker appeals.

## ASSIGNMENTS OF ERROR

Schicker assigns, restated, that (1) the district court erred in finding that there had been no meeting of the minds during the formation of the contingency fee agreement, and (2) Cady violated

her duty of good faith and fair dealing by seeking to fire Schicker after learning that the insurance claim would be paid.

## STANDARD OF REVIEW

Whether a contract exists is a question of fact; the meaning of a contract is a question of law. *Ross, Schroeder v. Artz*, 23 Neb. App. 545, 875 N.W.2d 457 (2016). In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict, which an appellate court will not disturb on appeal unless clearly wrong. And an appellate court does not reweigh the evidence but considers the judgment in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party. *Id*.

An appellate court independently reviews questions of law decided by a lower court. *Bruce Lavalleur, P.C. v. Guarantee Group*, 314 Neb. 698, 992 N.W.2d 736 (2023).

## ANALYSIS

*Meeting of the Minds.*

Schicker first assigns that the district court erred in finding that there had been no meeting of the minds during the formation of the contingency fee agreement. He argues that Cady's admissions at trial evidence that a meeting of the minds had occurred.

A party seeking to enforce a contract has the burden of establishing the existence of a valid, legally enforceable contract. *Acklie v. Greater Omaha Packing Co.*, 306 Neb. 108, 944 N.W.2d 297 (2020). To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract. *Id*. It is a fundamental rule that in order to be binding, an agreement must be definite and certain as to the terms and requirements. It must identify the subject matter and spell out the essential commitments and agreements with respect thereto. *Id*.

Cady testified at trial that the first paragraph of the contingency fee agreement was not completed at the time she signed the document. Though the blank line of the fee agreement was filled in with "Lincoln Financial," indicating that the fee agreement involved a claim Cady may have against LFG, Cady testified that the blank line was not filled in, nor did reference to LFG appear anywhere in the agreement, at the time she signed it. Schicker did not testify to the condition of the fee agreement at the time the parties signed and did not otherwise present evidence to refute Cady's testimony.

Schicker testified that he was retained to represent Cady on both the personal injury claim and the insurance claim. However, Cady testified that she had retained Schicker to represent her solely on the personal injury claim. The personal injury claim is not included in the fee agreement and there was no evidence that another fee agreement related to the personal injury claim was executed.

Cady admitted at trial that she was aware that the insurance claim was approved by LFG prior to terminating Schicker's services and Klenda's notes reflect that Cady sought a delayed disbursement to avoid paying Schicker a contingency fee related to the insurance claim. However, the evidence at trial demonstrated that Cady wanted to resolve any question about whether Schicker was representing her on the insurance claim, as she believed he was not.

A fundamental and indispensable basis of any enforceable agreement is that there be a meeting of the minds of the parties as to the essential terms and conditions of the proposed contract. *Gibbons Ranches v. Bailey*, 289 Neb. 949, 857 N.W.2d 808 (2015). Schicker argues there was irrefutable evidence at trial that he was retained by Cady to represent her in connection with her claim against LFG, as evidenced by the contingency fee agreement together with her admissions to such at trial. But contrary to this assertion, at trial, Cady testified the agreement she signed did not contain any reference to the matter Schicker agreed to handle which gave rise to her confusion governing the scope of his representation. As to this conflict in evidence, the court found that Cady provided the more credible account and that the contract failed to address the scope of Schicker's representation. Giving weight to the trier of fact who heard and observed the witnesses, we do not find the court clearly erred in this determination. As such, as to this critical fact, to wit, the scope of Schicker's representation of the client, we agree the contingency fee agreement between the parties did not contain all of the essential terms at the time it was executed by the parties, namely who Schicker was actually going to be pursuing a claim against. Because a meeting of the minds had not occurred, there existed no valid, enforceable contract between the parties. The district court did not err in so finding.

*Good Faith and Fair Dealing.*

Schicker also assigns that Cady's attempt to fire Schicker was evidence of her violation of a duty of good faith and fair dealing, because Cady knew that the full insurance claim would be paid prior to firing Schicker on October 2, 2017. Because LFG had agreed to pay the insurance claim prior to his firing, Schicker argues that he had earned his 40 percent contingency fee and was entitled to recovery.

Schicker did not raise Cady's alleged breach of her duty of good faith and fair dealing in his complaint or at trial. An appellate court will not consider an argument or theory raised for the first time on appeal. Thus, when an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition. *Elbert v. Young*, 312 Neb. 58, 977 N.W.2d 892 (2022).

Moreover, because we found above that a valid, enforceable contract did not exist between the parties, we need not consider whether Cady was bound by an implied covenant relating to the agreement. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Avis Rent A Car Sys. v. McDavid*, 313 Neb. 479, 984 N.W.2d 632 (2023). Thus, we do not address this assignment of error further.

CONCLUSION

We find no error in the district court's determination that there was never a meeting of the parties' minds concerning the claim at issue in the contingency fee agreement. We affirm the district court's finding that a valid contract did not exist and its dismissal of Schicker's complaint.

AFFIRMED.